## Lewis, et al. v. Bullock.

(Decided March 15, 1927.)

Appeal from Pulaski Circuit Court.

Deeds—Evidence Held to Not Show that Grantor was Insane When Executing Deed.—Letter directing purchase of sheekskin, written by grantor while at hospital, and fact that he conveyed 55 acres of land in part consideration for grantee giving grantor's horse good treatment, held not to show that he was of unsound mind at time of executing deed, requiring additional consideration of $100, and reserving control and benefits of land during grantor's life, though grantor was, subsequent to execution of, and prior to delivery of deed, adjudged insane.

C. L. TARTER, H. E. CUNDIFF and WESLEY & SON for appellants.

W. M. CATRON for appellee.

OPINION OF THE COURT BY JUDGE LOGAN—Affirming.

Charles H. Lewis was an old stonecutter living at Somerset in Pulaski county. He came to Kentucky from Michigan many years ago and he resided in Pulaski county until January, 1925, when he died. Prior to his death he was the owner of 55 acres of land on the waters of Pitman creek in Pulaski county. About the first of July, 1924, he became ill and went to a hospital in Somerset. While in the hospital the appellee, Bingham Bullock, who was residing on his farm, visited him and he requested Bullock to get someone to prepare a deed from himself to Bullock for the land now in controversy. Bullock saw W. F. Linville, the circuit court clerk of Pulaski

county, and informed him of the desire of Lewis to execute a deed. Linville went to the hospital and prepared the deed from Lewis to Bullock. This deed was executed on the 25th day of July, 1924, and the consideration is expressed in the following paragraph:

"That said party of the first part, for and in consideration of the sum of one hundred ($100.00) dollars cash in hand paid, receipt of which is hereby acknowledged, and good treatment and care of one black horse named Dick, until the death of said horse, party of the first reserving the care, custody, control and benefits of the following described property during his natural life, at the expiration of which this deed is to go into effect (to secure deferred payment a lien is retained upon the property hereinafter described) do hereby sell and convey to the party of the second part, his heirs and assigns the following described property, to-wit: both real and personal."

The two children of Charles H. Lewis, that is, Harvey Lewis and Maude Lewis Wilson, attack this deed on the ground that Bingham Bullock by fraud procured and induced the said Charles H. Lewis to execute and deliver to him the deed for said property, and that at the time said deed was executed the said Lewis was of unsound mind, unable to know the consequences of his act or to comprehend the value of the property conveyed.

The proof shows that Charles H. Lewis remained in the hospital at Somerset for some weeks, when he was taken to a hospital at Martinsville, Indiana, by his son, where he remained for several weeks. While he was in the hospital at Martinsville an inquest as to his sanity was held in Pulaski county and he was declared of unsound mind, and the judgment directed that he be taken to the state hospital for the insane at Lexington. He remained at Martinsville for some time thereafter, when he was brought back to Somerset and again entered the hospital, where he remained until his death. The deed which he executed was not delivered to Bullock at the time of its execution, and after his return to the hospital he directed that the deed be brought to him, which was done, and he delivered it to Bullock and instructed him to have it recorded.

The evidence is fairly well balanced as to whether he was sane or insane at the time he executed the deed. The chancellor who considered the case reached the conclusion that he was sane at the time the deed was made. The petition was, therefore, dismissed and appellants have brought the record here asking for a reversal. On the record we would not be justified in holding that the chancellor erred in his conclusion that the deed should be upheld, as his judgment is not against the weight of the evidence.

It is urged that the deed shows on its face that Lewis was not of sound mind, that the inadequacy of the consideration is proof of that fact, and that the inadequacy of the consideration, when coupled with the unusual consideration that Bingham Bullock was to see that the black horse named Dick received good treatment and care until the death of said horse, is sufficient to justify the setting aside of the deed. It is true that the consideration paid in money for the farm was inadequate, as the proof tends to show that the farm was worth about $1,500.00. It must not be overlooked, however, that the money paid was not the main consideration. Lewis retained the right of occupancy and control of the farm during his life. He was providing for himself a place to stay where he might have the attention and care which had been denied him by his family. He knew when he executed the deed that the days were fast approaching when he would need such comforts as might be given him during his declining years. The assurance that he would be cared for and that he would have a home where he might stay was part consideration for the execution of the deed.

Moreover, he had a horse named Dick, and he loved that horse, as well he might, since he had no family to love. We may infer that the horse named Dick was the sharer of his joys and his sorrows. He was not unlike "'Ostler Joe," as described in one of the most pathetic little poems in the English language. Those who know the poem will recall that the wife of "'Ostler Joe" fled with a handsome, smooth-tongued stranger, leaving with him the fair-haired baby, but "'Ostler Joe" made no complaint, "saving what he told his horses, saving what he told his God," and may we not surmise that Lewis, whose wife, years before, had fled with another man, taking with her his two young children, like " 'Ostler Joe," had told his horse named Dick his troubles and his

heartaches? Be that as it may, he wanted his horse named Dick cared for and given good treatment as long as the horse should live. He had been looking for a man in whom he could place his trust, a man that he believed would be kind to him, if he should need kindness, and one who would give good treatment to his horse named Dick. He did not want his horse to fall into the hands of a "Nicholas Skinner" who, by his cruelty, made the life of "Black Beauty" so hard that the horse wished he might fall down dead and be out of his misery, but rather he was looking for a "Farmer Thoroughgood" who, with those about him, had a kind and humane voice. He believed that Bingham Bullock was the man he was looking for and if he measured up to his name no doubt the old man made no mistake in his choice.

It is insisted that his giving the farm to Bingham Bullock in part consideration for his giving the horse named Dick good treatment is proof that the mind of the old man was unbalanced when he executed the deed; that a man competent to take a rational survey of his property and who knows the natural objects of his bounty and is capable of disposing of his property according to a fixed purpose of his own, would not have done such a thing. Some men have no love for dumb animals; they do not return the affection shown them by the horse or the dog, while some men passionately love such animals and will protect them even at the risk of their own lives. They, as it were, are the sons of the Great Spirit who see the same God-given life in the dumb animals as they feel within themselves. Life is the same, whether it be that pulsating through the body of the horse or the man, for so it is written in God's Holy Book where the Preacher said:

"For that which befalleth the sons of men befalleth beasts; even one thing befalleth them; as the one dieth so dieth the other; yea, they have all one breath; so that a man hath no pre-eminence above a beast; for all is vanity.

"All go unto one place; all are of the dust, and all turn to dust again." (Ecclesiastes, chap. 3, verses 19, 20.)

In every age and country the horse and the dog have been rivals among dumb animals for the first place in the affections of man. The greatest of earth, so history re-

cords, have been devoted to the horse. The love of Alexander the Great for his horse Bucephalus is an example. His horse died as a result of wounds received in battle in the year 326 B. C., and in commemoration of his death Alexander built the city of Bucephala, the site of which remains to this day. Pegasus, the famous winged horse of Greek fable, sprang from the trunk of the Gorgon Medusa when her head was cut off by Perseus, and the name of the horse is as well known today as the name of Caesar or Alexander.

Hebrew poetry abounds with references to the noble horse. In their progress to Palestine the Israelites found the Canaanites with horses and chariots, and when David divided the kingdom of northeastern Syria he kept from the slaughter beautiful horses enough for his 100 chariots. All through the Bible we read of horses in connection with war, and always we find that man held his horse in the highest degree of affection.

Cotton Noe, the poet laureate of Kentucky, in his drama, "The Blood of Rachel," makes Queen Vashti say of her husband, Ahasuerus, "Why, often I have heard him praise his horse in language that seemed kindled at the altar of the gods." General Robert E. Lee loved his princely "Traveler," and General Sheridan adored the horse that carried him to the battle "from Winchester twenty miles away." Shakespeare, Cervantes, Hugo and Scott have given of their great genius in praise of the horse.

Was Alexander crazy because he loved his horse? or Lee or Sheridan? Was Shakespeare crazy because he lent his scintillating genius to the praise of the horse? or Cervantes or Hugo or Scott? If they were not, and there is none to say they were, why should we conclude that the old stonecutter, Charles H. Lewis, a humble citizen of the hills in our own state, was crazy because he desired to provide for the good treatment of his horse named Dick and that this horse should receive gentleness and kindness in his declining days as he passed towards the Valley of the Shadow?

It is argued that Lewis wrote a letter to the family of Bingham Bullock while he was in the hospital at Martinsville asking Bullock to procure for him a sheepskin, and that this letter is proof of a disordered mind.

The letter reads as follows:

"The New Highland Mineral Springs Sanitarium, Martinsville, Ind., Oct. 1st, 1924.

Hello Bingham and fimily,

hope you are all well and enjoyn health. I am some better but far from been well. Can walk around the room by holden to things & cant sett down without hurten. I want you to gett me a sheepskin abott 18 inches squire with wool about 1½ long. Cant you gett one aroun the naborhood. I have just got to have it no matter what it costs.

Pleas see what you can find. I hope you are getting along all right. anser soon.

"Yours

"C. H. Lewis."

This letter was written after Lewis had been declared insane by the proceedings in Pulaski county. We find no evidence of insanity in this letter, but, on the other hand, it appears that the old man had an intelligent idea of what he wanted, and while his spelling is bad and his language is peculiar he clearly explained his wants.

Our forefathers, the pioneers who settled this state, had a great affection for a sheepskin such as old man Lewis wanted Bullock to buy for him. They used it to cover their saddles as they made long trips on their wiry horses over the trails, and if, perchance, night overtook them before they reached some friendly cabin the sheepskin afforded them a necessary couch upon which they might rest their weary bodies as they gazed into the star-decked heavens through the long and lonesome night. As old age came on the noble sheepskin covered the seat of the rough home-made chairs and afforded comfortable sitting for the gray-haired pioneers as they watched the rising of the morning sun or the close of the dying day. He sat on his sheepskin and in restrospect dreamed of the days of his life as he waited for the engulfing shadows which would soon encircle him within their yielding bosom.

Old and ill, with the cares of life casting their burdens upon his bent shoulders, can it be said that Lewis was crazy when he wrote that letter to Bullock asking that he purchase a sheepskin at any cost? He needed it, so he said, because he could not "set down without its hurten." We think not. It was not a man with a mind

deranged who wrote that letter. Like the rest of us he was seeking the comforts of life, and that which he needed most at that time was a sheepskin with long wool which he might use as a couch, downy and soft. In the day of his affliction he thought of the homely sheepskin, glorious emblem of the hardy pioneer, and it seemed more desirable to him at the time than the velvet covered softness of the throne of a king. He had the money to pay for it and he had confidence in Bingham Bullock, to whom he had intrusted the care and custody of his horse named Dick, so he directed him to procure the sheepskin at any cost. It was not a lambskin that he wanted, although it has been said that the lambskin is more ancient and honorable than the Golden Fleece or Roman Eagle. He wanted a plain sheepskin with long wool. Coupled with his love and affection for the horse named Dick, his letter directing the purchase of the sheepskin is stronger proof of his sanity than the combined testimony of learned experts to the contrary, and from the whole record we have reached the conclusion that Charles H. Lewis was competent to understand the nature and consequences of his act when he executed the deed.

Judgment is affirmed. Whole court sitting.